Victor J. Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S Sepulveda Suite 1121
Los Angeles, CA 90034
T: 562-534-5907
E: victor@almeidalawgroup.com

Arturo Peña Miranda (SBN 325108)
**STERLINGTON, PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
T: (212) 433-2993
E: arturo.pena@sterlingtonlaw.com

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| A.G., B.R., and R.M., on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> STIIIZY, INC., <br><br> *Defendant.* | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **1. BREACH OF CONFIDENCE;** <br><br> **2. BREACH OF EXPRESS CONTRACT;** <br><br> **3. BREACH OF IMPLIED CONTRACT;** <br><br> **4. UNJUST ENRICHMENT;** <br><br> **5. VIOLATION OF CAL. PENAL CODE § 631;** <br><br> **6. VIOLATION OF CAL. PENAL CODE § 632;** <br><br> **7. INTRUSION;** <br><br> **8. PUBLICATION OF PRIVATE FACTS;** <br><br> **9. VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2510, *et seq*.** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

0

Plaintiffs A.G., B.R., and R.M.,[1] on behalf of themselves and all others similarly situated, bring this action against Defendant STIIIZY, Inc. ("STIIIZY"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## INTRODUCTION

*At STIIIZY, we respect your ability to know, access, correct, transfer, restrict the processing of, and delete your personal information. We strive to only collect and use the personal information, and other sensitive personal information that we need[.][2]*

1.      STIIIZY is the largest cannabis dispensary conglomerate in the State of California that markets and sells marijuana to consumers across the United States, including in California – many of whom are medical cannabis patients.

2.      Using marijuana for medical relief is not a casual purchase—it is, in the California Legislature's estimation, "a personal and private matter between [doctor and patient]."[3] California's medical-cannabis framework, acknowledging the privacy concerns related to cannabis use, requires protocols "to protect the confidentiality of program records," and imposes penalties for anyone who "breaches the confidentiality requirements" of identification-card-program records.[4]

---

[1] Due to the sensitive nature of Plaintiffs' communications with Defendant and its website, Plaintiffs will be filing a Motion to Proceed Pseudonymously.

[2] *STIIIZY Privacy Policy*, https://www.stiiizy.com/privacy-policy (last visited Apr. 26, 2026).

[3] Cal. Health & Safety Code § 11362.5 (Compassionate Use Act of 1996), enacted by Proposition 215 (1996), and Cal. Bus. & Prof. Code § 26000, *et seq.* (Medicinal and Adult-Use Cannabis Regulation and Safety Act).

[4] Cal. Health & Safety Code § 11362.71(1); Cal. Health & Safety Code § 11362.81(4).

3. Expressly on account of the unique stigma associated with cannabis use,[5] California enacted strong privacy protections for cannabis consumers out of its normally sweeping Public Records Act. *See* Cal. Health & Safety Code § 11362.5.

4. Cannabis dispensaries therefore shoulder a significant responsibility: patients entrust them with highly sensitive health and other personal data—including qualifying conditions, cannabis card numbers, and purchase histories—on the understanding that this information will remain strictly confidential.

5. As part of its business practices, STIIIZY operates a website, available at www.STIIIZY.com (the "Website"), where cannabis consumers seek to find relief for painful (and sometimes terminal) illnesses.

6. As one of the United States' largest purveyors of marijuana products, STIIIZY knows, or should know, the importance of protecting its customers' privacy. Indeed, STIIIZY admits on its own Website that customers' privacy "is important."[6]

7. Despite this, STIIIZY chose to install various tracking technologies from an astounding number of third-party data brokers on its Website that monitor its consumers' every move.[7]

8. In installing these invisible trackers, including the Meta Pixel, Google Analytics, Google DoubleClick, and Lotame tracking codes ("Tracking Technologies"), Defendant chose to allow third parties to identify specific users and

---

[5] California's Constitutional right to privacy, established in Article I, Section 1, has been interpreted by California courts to protect sensitive personal information, including medical records and cannabis use. *See* Cal. Const. Art. I, § 1; *see Hill v. National Collegiate Athletic Assn.*, 7 Cal.4th 1, 35 (1994) (listing "medical records" among protected categories).

[6] *STIIIZY Privacy Policy*, https://www.stiiizy.com/privacy-policy.

[7] These companies are, at a minimum: Facebook, Google, Klaviyo, LiveRamp, Lotame, Microsoft, Neustar, RFIhub/RocketFuel, Tapad, Throtle, Twitter, and Shopify.

monitor every step of their activity on the Website including which pages and cannabis products they view, which STIIIZY products they add to their carts, and what they purchase.

9. Thus, in addition to being a major seller of cannabis products, STIIIZY is also a major seller of customer information, which then goes on to be sold (potentially unlimited times) to any number of third parties which then collect, analyze and use it for financial gain, including for targeted advertising of cannabis products.

10. While STIIIZY is very much a cannabis company, it is very much also a data processor. The data and knowledge that STIIIZY has—i.e., whether certain individuals are cannabis users—is highly valuable to other cannabis companies and ancillary cannabis businesses.

11. In the course of doing business, STIIIZY collects personally identifiable information and sensitive health information through the STIIIZY Website. The personal and health information STIIIZY collects includes but is not limited to: full name, email address, internet protocol address (which can reveal users' location), information about cannabis purchases and activity on the STIIIZY Website, and physical location using geolocation data.

12. And while STIIIZY states that it collects this information in its Privacy Policy, it does not disclose that it is selling sensitive information—including the fact that users are browsing and buying cannabis for medical or recreational purposes— to "Big Tech" advertisers like Facebook, Google, and others.

13. Marijuana consumers and especially medical marijuana patients, like any other medical patients needing any other medication, have a fundamental right to privacy. The stigma surrounding cannabis use persists despite its legalization by many states, and many marijuana users fear potential repercussions of their family, their employer, or the federal government finding out that they use cannabis: a

3

product which remains federally illegal.

14. When using the STIIIZY Website, Plaintiffs did not anticipate or consent to the use of extensive tracking technology that would transmit personal health information to dozens of third party data brokers and other unauthorized companies. Against this backdrop, Plaintiffs, on behalf of themselves and all others similarly situated, bring this action, seeking actual damages, statutory damages, treble damages, declaratory and injunctive relief, costs of suit, pre- and post-judgment interest and reasonable costs and attorneys' fees under state law.

**JURISDICTION AND VENUE**

15. *Subject Matter Jurisdiction.* This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interests and costs, there are well over 100 putative Class members, and minimal diversity exists because one or more putative Class members are citizens of a different state than at least one Defendant.

16. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant because STIIIZY is a California corporation with its principal place of business located in the state of California—specifically, in this District. Additionally, this Court has personal jurisdiction over Defendant because Defendant intentionally availed itself of this jurisdiction by choosing to do business in California. Defendant STIIIZY has many locations in California and knew or should have known that its tracking technologies were being used to intercept the actions of Plaintiffs and Class members on the STIIIZY website.

17. *Venue.* Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant STIIIZY is located in this District, Defendant conducts business in this District, and a substantial part of the events, acts and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

*Plaintiffs*

18.    Plaintiff A.G. is a citizen of the State of California residing in Los Angeles County.

19.    Plaintiff B.R. is a citizen of the State of California residing in Los Angeles County.

20.    Plaintiff R.M. is a citizen of the State of California residing in Napa County.

*Defendant STIIIZY, Inc.*

21.    Defendant is a California corporation with its headquarters located at 728 E Commercial St., Floor 2, Los Angeles, California, 90012.

22.    STIIIZY is the largest cannabis dispensary conglomerate in the State of California, with multiple retail locations across California, and annual revenue over $800 million.

## FACTUAL BACKGROUND

### A. Marijuana in the United States

23.    In the United States, cannabis-derived products were commonly used as medicine for ailments and chronic pain during the 19th and into the 20th century. But in 1937, with the passage of the "Marihuana Tax Act," the federal government imposed stringent federal restrictions on the use and sale of cannabis in the U.S. And, from about 1937 through the mid-1990's, cannabis consumption of any kind was by and large forbidden in the U.S.

24.    Throughout this period, cannabis consumption developed a negative stigma and was (and is) used as a pretext to arrest predominantly men and women of color in many places throughout the country.[8] These pretexts and divisions along

---

[8] *See, e.g.*, Amanda Geller *et al.*, *Pot as Pretext: Marijuana, Race, and the New Disorder in New York City Street Policing*, 7 J. of Empirical Legal Studies 591

racial lines still have not faded.

25.    In 1996, California became the first state to allow consumption of cannabis for medical purposes. Since then, most states have legalized cannabis use. Additionally, several states have legalized cannabis consumption—though with differing rules on specific types of consumption—for recreational use, beginning with Washington and Colorado in 2012.

**B. STIIIZY's Privacy Representations**

**i.  The 2019 Privacy Policy (Effective May 31, 2019 – June 29, 2023)**

26.    From at least May 31, 2019 through June 29, 2023, STIIIZY maintained a privacy policy on its Website which made an unequivocal promise regarding third-party data sharing: "We do not sell, trade, or otherwise transfer to outside parties your Personally Identifiable Information unless we provide users with advance notice."[9]

27.    This representation communicated to consumers that their personally identifiable information would remain with STIIIZY and would not be shared with outside companies without prior notice and an opportunity to respond.

28.    The 2019 Privacy Policy further represented: "We do not include or offer third-party products or services on our website." This statement communicated that consumers interacting with STIIIZY.com would encounter only STIIIZY's own content—not secretly embedded tools, pixels, or scripts operated by third-party advertising or analytics companies.

---

(2011); Maha N. Mian *et al.*, *Policing Pot: State-Level Cannabis Arrests Increase Perceived Risks and Costs but Not Use*, 5 Cannabis 40 (2022); Alex Kreit, *Marijuana Legalization and Pretextual Stops*, 50 Univ. of Cal. L. Rev. 741 (2017).
[9] *See Privacy Policy*, Stiiizy, https://web.archive.org/web/20220520115820/https://www.stiiizy.com/pages/privacy-policy (archived May 20, 2022).

29. While the 2019 Privacy Policy disclosed the use of certain Googletrackers, it disclosed no other third-party tracking technologies and only vaguely alluded to allowing "third-party behavioral tracking."

30. The 2019 Privacy Policy presented an apparent inconsistency: it indicated that STIIIZY would not share users' personally identifiable information, yet acknowledged the use of certain tracking technologies. The Policy resolved this tension by stating that "non-personally identifiable visitor information may be provided to other parties for marketing, advertising, or other uses." This clarification assured users that any tracking technologies referenced in the Policy would not transmit personally identifiable information.

### ii. The 2023 Privacy Policy (Effective June 30, 2023 – May 19, 2025)

31. On June 30, 2023, STIIIZY replaced the 2019 Privacy Policy. The 2023 Privacy Policy represented: "We do not sell your personal information but may use and share such information as described below." It further represented that STIIIZY "strive[s] to only collect and use personal information that we need."[10]

32. The 2023 Privacy Policy acknowledged for the first time that STIIIZY collected sensitive personal information, including "geolocation information, account log-in, and health information such as medical marijuana card or doctor recommendations." STIIIZY represented that this sensitive information would be shared only with "[s]ervice providers, affiliates, and contractors with whom we do business" and "[o]ther third parties for specific purposes provided at the time of collection."

---

[10] *See Privacy Policy*, Stiiizy, https://web.archive.org/web/20230705053848/https://www.stiiizy.com/policies/privacy-policy (archived July 5, 2023).

33.    For every category of personal information in the policy's disclosure table—identifiers, commercial information, internet activity, and sensitive personal information—the "Selling" column stated: "We do not sell this information."

34.    As to tracking technologies, the 2023 Privacy Policy disclosed only Google Analytics by name and stated that STIIIZY "uses Google Analytics, a web analytics service provided by Google, Inc." No other analytics, advertising, or identity-graph platforms were disclosed.

### iii. The 2025 Privacy Policy (Effective May 20, 2025 – Present)

35.    On May 20, 2025, STIIIZY again revised its Privacy Policy.[11] The 2025 Privacy Policy added several disclosures absent from prior versions, including for the first time: (a) a section on "Interest-Based Advertising" acknowledging that STIIIZY works "with third party advertising companies and social media companies" that "use cookies and other technologies to collect data . . . on your activity over time across our Services and other online services"; and (b) a disclosure that STIIIZY uses "artificial intelligence (AI) and machine learning technologies, including generative AI, to facilitate the processing of personal information."

36.    These after-the-fact disclosures—interest-based advertising and AI processing, among other things—are themselves evidence that STIIIZY's prior privacy policies failed to accurately describe its data practices. As set forth below, the 2025 revisions did not introduce new tracking practices; they retroactively acknowledged tracking practices that had been occurring throughout the period covered by the 2019 and 2023 policies without even the façade of doing so with consumer knowledge or consent.

---

[11] *See Privacy Policy*, Stiiizy, https://web.archive.org/web/20250605073647/https://www.stiiizy.com/policies/privacy-policy (archived May 20, 2025).

8

37. Even after the 2025 revisions, STIIIZY's Privacy Policy still failed to identify by name the specific third-party companies receiving consumer data other than Google Analytics.

**C. Common Representations Across All Three Privacy Policies**

38. Notwithstanding any differences in language and disclosures, each version of STIIIZY's Privacy Policy during the Class Period—the 2019 Policy, the 2023 Policy, and the 2025 Policy—made a consistent and uniform set of representations to all Website users. These common representations formed the baseline of every class member's reasonable expectation of privacy when they visited the STIIIZY Website to browse, research, or purchase cannabis products.

39. Each version of STIIIZY's Privacy Policy affirmatively represented to consumers that STIIIZY did not sell their personal information. The 2019 Policy stated: "We do not sell, trade, or otherwise transfer to outside parties your Personally Identifiable Information unless we provide users with advance notice." The 2023 Policy stated, across every category of personal information in its disclosure table: "We do not sell this information." The 2025 Policy stated: "We do not sell your personal information." None of the three policy versions disclosed that sensitive cannabis-related health information was being transmitted to identity-graph companies, data brokers, or commercial data marketplace operators. These representations were made uniformly to every user who visited the Website during the Class Period, regardless of which version of the Policy was operative at the time of their visit.

40. Throughout all three Policy versions, the only third-party tracking or analytics vendor ever identified by name was Google Analytics. The 2019 Policy disclosed the use of Google AdSense, Google Analytics, Google DoubleClick, and Google Display Network, and no others. The 2023 Policy identified only "Google Analytics, a web analytics service provided by Google, Inc." The 2025 Policy

9

likewise named Google Analytics and provided a Google-specific opt-out link. No version of the Policy ever disclosed by name any of the following vendors, each of which were operating data-collection technology on the STIIIZY Website: Meta (Facebook), Microsoft, Klaviyo, Twitter, Lotame, LiveRamp/TowerfData, Neustar, Tapad, Throtle, RFIhub/RocketFuel, and NavDMP.

41. Each version of STIIIZY's Privacy Policy represented that STIIIZY collected only the personal information it needed. The 2023 Policy stated that STIIIZY "strive[s] to only collect and use personal information that we need." The 2025 Policy repeated this representation verbatim. These representations communicated to consumers that data collection was purposeful and limited.

42. As set forth in detail in the sections that follow, each of these uniform representations was false, misleading, or materially incomplete as applied to every class member who used the STIIIZY Website during the Class Period. The actual data practices STIIIZY employed—described in more detail *infra*—were flatly inconsistent with what every version of its Privacy Policy told consumers.

43. Significantly, STIIIZY did not obtain the requisite consent from any of the named Plaintiffs or from putative class members before allegedly intercepting or disclosing their communications, in violation of CIPA.

44. Whereas STIIIZY's Privacy Policies explained that certain tracking technologies including third party cookies and Google trackers may be used to collect and share user data with third-party partners for analytics and advertising, they did not clearly inform users that such disclosures might occur in real time while users are communicating or interacting with the site, nor did STIIIZY secure the users' knowing and voluntary agreement to any potential interception of communications.

45. STIIIZY's vague references to data-sharing with third parties are insufficient under CIPA, which requires that users must know of and agree to any

10

interception or recording of their communications. Defendant did not obtain such consent in a distinct or conspicuous manner; rather, it buried these details within multi-purpose privacy policies that are not tailored to meet CIPA's standards for consent.

46.    Moreover, STIIIZY fails to give users a clear and conspicuous opportunity to refuse or withdraw consent to such interception and sharing on a case-by-case basis, even though CIPA requires meaningful consent for each intercepted communication.

47.    At no point did STIIIZY plainly inform Website visitors that their interactions on the Website may be intercepted and shared with third parties nor provide a straightforward mechanism to decline or revoke that sharing.

**D. STIIIZY's Violations of Privacy and Contract**

48.    STIIIZY is one of the largest owners and operators of cannabis dispensaries in the United States.  STIIIZY currently operates in:

      a.  Arizona (recreationally legal),

      b.  California (recreationally legal),

      c.  Illinois (recreationally legal),

      d.  New York (recreationally legal),

      e.  Nevada (recreationally legal),

      f.  Michigan (recreationally legal), and

      g.  Missouri (recreationally legal).

49.    In each of these states, as well as from any state in the United States, consumers can access STIIIZY's range of products through its Website.

50.    In the course of doing business to provide cannabis to its customers, STIIIZY collects a granular mix of personal and health information at every step of a customer's visit.

      **i.  Transmission to Third Parties: Pixels, Trackers, and Cookies**

51. This is how STIIIZY and the third-party advertisers intercept Defendant's customers' information: STIIIZY configured onto its Website several hidden types of code that are intended to and do collect the data that users input into the Website and data evidencing consumers' use of the Website, in combination with the users' identifying information (such as IP address and, for certain trackers such as the Meta Pixel and Google tracking codes, other unique identifiers including the user's unique Facebook ID).

52. This practice runs contrary to state and federal law and to commonly accepted practices with respect to the sanctity of personal health information.

53. The trackers that STIIIZY has placed or allowed to be placed on its Website belong to at least the following entities: Facebook, Google, Lotame, Microsoft, Klaviyo, Shopify, and Twitter.[12]

54. The widespread use of ad trackers and third-party cookies on STIIIZY's Website would shock a reasonable consumer.

55. When a user registers, signs in, browses a product page, adds a product to cart, or purchases a product, STIIIZY's embedded scripts transmit, either in whole or in part, this information to third parties operating ad trackers or cookies on the site to Facebook, Google, Lotame and likely other third parties.

*Exemplar screenshot of hidden Website source code from Facebook capturing the type of cannabis product being purchased and scheduled for delivery by a user, being shared with Facebook:*

56.     This data grab happens automatically in the background, in real time, every time a page loads. When a user views a specific product, adds it to cart, or proceeds to purchase, trackers used by STIIIZY intercept this communication and transmit both the product and purchase details along with unique user identifiers to third party data brokers, all without the user's knowledge or affirmative consent. These data brokers and ad networks can – and do – then link what the user does on STIIIZY to their user profiles and/or accounts, and to external advertising files about them.

57.     For example, the STIIIZY Website is configured to have the user's browser send various cookies to Meta.

58.     When a visitor accesses the Website while logged into Facebook, Defendant compels the visitor's browser to transmit a unique identifying cookie to Meta called "c_user."

59.     The c_user cookie contains a Facebook user's unencrypted Facebook ID. A Facebook ID allows anybody (not just Facebook) to identify the individual consumer. Specifically, if one types www.facebook.com/[FacebookID] into a web browser, it will load that individual's Facebook page.

60.     The Meta Pixel also transmits an "fr" cookie which contains, at least, a browser identifier and encrypted Facebook ID. The fr cookie has a lifespan of 90 days.

61.     STIIIZY's Meta Pixel on its Website creates several events every time a consumer goes to a webpage and selects a product. These events (including PageView, SubscribedButtonClick, and AddToCart) automatically send data to Meta and disclose the product's title and additional details, for example, if the user is choosing to schedule delivery.

*Exemplar screenshots demonstrating that the Meta Pixel is capturing the fact that the user is adding a certain cannabis product to their cart (Gelato pre-rolls), the*

13

*product's cost, and that the customer is scheduling delivery:*



62.     As an example of further surreptitious tracking, the Meta Pixel also captures and discloses to Meta when STIIIZY's customers proceed to checkout and purchase the product, including the details of the purchase:

14

63. Simply stated, every page the user opens sends his or her personal and medical-cannabis details off STIIIZY's Website and into several outside data systems operated by Big Tech data brokers.

64. Taken together, these data points reveal not only who the customer is but also that they are a cannabis user, which dispensary they frequent, what products they review or purchase, and when and where each interaction occurs—all highly sensitive health information that a reasonable cannabis consumer would expect STIIIZY to keep confidential.

65. But rather than protect such information, STIIIZY sells it to third party advertisers, who receive Plaintiffs' and Class members' information every time they use the STIIIZY Website.

### ii. Third Party Cross-Reference, Resale and Mass Dissemination of STIIIZY's Customers' Personal Information

66. The third parties receiving Plaintiffs' and Class members' information are not mere ministerial vendors performing purely administrative or mechanical tasks on behalf of STIIIZY. To the contrary, some trackers on STIIIZY's Website support behavioral targeting for online ads, along with other methods of retargeting and advertisement.

67. STIIIZY has embedded third-party tracking technologies on its Website from several Big Tech data brokers including Meta, Google, and Lotame. Each of these trackers collects information about STIIIZY's Website visitors and transmits

that data to its parent company, where it is used for advertising, profiling, and other commercial purposes.

68. **Meta Pixel:** Meta's tracking pixel collects extensive data about visitors to websites where it is installed, including browsing behavior, page views, button clicks, IP addresses, device identifiers, and—when available—personally identifiable information such as names, email addresses, and purchase details.[13] It combines user site visits with a user's "c_user" ID, a unique digital tag which specifically identifies web users by linking directly to a user's Facebook profile.[14] Meta combines this data with the billions of other data points it already possesses about its users to build detailed advertising profiles.[15] Meta Pixel can transmit sensitive health information to Meta, enabling it to target users based on that health data.[16] Meta permits advertisers to create "Custom Audiences" and "Lookalike Audiences" based on collected data, and shares aggregated user information with advertisers to optimize ad targeting.[17]

69. **Google Analytics and Google Ads:** Google's tracking technologies collect user behavior data including pages visited, time on site, actions taken, device information, and IP addresses.[18] When site owners enable Google's advertising

---

[13]*What data does the Facebook Pixel collect?*, https://www.create.net/support/what-data-does-the-facebook-pixel-collect (last visited Apr. 19, 2026).

[14] https://cookiedatabase.org/cookie/facebook/c_user/ (last visited Apr. 19, 2026).

[15] *How We Built a Meta Pixel Inspector* (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited Apr. 19, 2026).

[16]Press Release, Fed. Trade Comm'n, *FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising.

[17]*Meta Pixel GDPR Compliance: Key Insights and Best Practices* (June 30, 2025), https://gdprlocal.com/meta-pixel-gdpr-compliance/ (last visited Apr. 19, 2026).

[18]*Safeguarding your data*, Google Analytics Help, https://support.google.com/analytics/answer/6004245 (last visited Apr. 19, 2026).

16

features—including remarketing and advertising reporting—this data is integrated into Google's advertising ecosystem and used to personalize advertisements across Google's display network and other properties.[19] According to Google's own documentation, it "uses the information shared by sites and apps to deliver our services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on our partners' sites and apps."[20] Google collects and combines data from the millions of websites running its trackers to build advertising profiles that follow users across the internet.[21]

70.    **Lotame:** Lotame identifies as "the #1 independent global data and identity solution."[22] Lotane operates what it describes as one of the "most extensive data exchanges" in the world—the Lotame global data exchange (LDX)—through which data providers contribute behavioral signals that Lotame aggregates into enriched audience segments and makes available to third-party advertisers and marketers for purchase.[23]

71.    Lotame's cookie-sync beacon matches the visitor's cookie-based digital fingerprint to Lotame's Panorama ID, adding demographic and interest data to the visitor's advertising profile. Lotame's cookie-sync beacon is designed to merge user identifiers across platforms. A user's interaction with the Lotame beacon

[19]*Id.*

[20]*How Google uses information from sites or apps that use our services*, https://policies.google.com/technologies/partner-sites (last visited Apr. 19, 2026).

[21]*Google Analytics Privacy Issues: Is It Really That Bad?* (June 8, 2022), https://matomo.org/blog/2022/06/google-analytics-privacy-issues/.

[22] *Publicis to acquire Lotame the world's leading independent end-to-end data solution* (March 6, 2025), https://www.publicisgroupe.com/en/news/press-releases/publicis-to-acquire-lotame-the-world-s-leading-independent-end-to-end-data-solution.

[23] Brian O'Connor, *Data Exchange: How Does It Work?*, LOTAME (Nov. 14, 2023), https://www.lotame.com/resources/back-basics-data-exchange-work/.

17

in the Website extends the user's footprint beyond the Website, allowing external data brokers to merge on-site behavior with profiles collected elsewhere and to re-identify the same person across future visits and other properties.

*A Lotame Panorama ID sync that tags the visitor with demographic and interest attributes.*



72.    The companies operating these trackers are not mere passive recipients of data. Rather, they are among the world's most sophisticated data aggregators, possessing detailed profiles on billions of individuals built from countless digital touchpoints. When STIIIZY transmits customer data to these platforms, that data does not exist in isolation—it is merged with vast troves of information these companies have already accumulated, creating enriched profiles that reveal intimate details about users' lives, interests, and behaviors.[24]

73.    This data enrichment process means that a user's cannabis browsing on STIIIZY's Website becomes linked to his or her broader digital identity. Meta can connect a STIIIZY visitor to his or her Facebook personal account, and Google can link the visit to years of search history and their Google accounts. The result is that visiting STIIIZY's Website does not merely inform STIIIZY about user behavior—

---

[24] Fed. Trade Comm'n, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking* (Mar. 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking.

it informs some of the world's largest corporations that a particular individual is a cannabis consumer.

74. Each of these third-party recipients uses the collected data for its own commercial purposes, including behavioral advertising, audience targeting, and data monetization. The platforms then facilitate the delivery of targeted advertising to users based on their cannabis-related activity, causing users to receive cannabis advertisements across unrelated websites, social media platforms, and mobile applications—alerting anyone who might observe his or her screen that the user consumes cannabis.

75. The Federal Trade Commission has specifically warned that the use of tracking pixels can cause serious consumer harms when used on health-related websites. In enforcement actions against GoodRx and BetterHelp, the FTC found that the companies' use of tracking pixels to share health information with Meta and other advertising platforms violated federal law.[25]

76. For these comparable privacy violations, the FTC's remedies have included comprehensive bans on sharing health information for advertising purposes—precisely the type of sharing that STIIIZY's trackers enable.[26] As the FTC's Office of Technology explained, "tracking pixels . . . enable platforms to amass, analyze, and infer information about user activity," and "with pixels, any type of personal and identifying information can be collected and shared."[27]

77. By embedding these tracking technologies on its Website, STIIIZY has made its customers' sensitive cannabis usage data available to major technology

[25] Fed. Trade Comm'n, *GoodRx Stipulated Order for Permanent Injunction* (Jan. 24, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/goodrx_stipulated_order_for_perman ent_injunction_civil_penalty_judgment_and_other_relief.pdf (last visited Apr. 19, 2026).
[26] *Id.*
[27] *Id.*

corporations, each of which combines this data with its own extensive user databases and uses it for advertising, profiling, and commercial purposes that STIIIZY customers neither anticipate nor authorize.

78.    The disclosure at issue is not a single transmission to a single party, but a continuous exfiltration of sensitive data to multiple sophisticated data aggregators, each of which integrates that data into commercial systems that operate largely outside consumer awareness or control.

### iii. STIIIZY Customers' Cannabis Use Is a Private Matter

79.    Logically, STIIIZY knew or should have known that by embedding code, it was disclosing and permitting advertisers to intercept and collect information shared by its Website users, including the personal and health information of Plaintiffs and Class members.  This is because the code used in this scenario needed to be affirmatively and intentionally placed on the Website in order to be used in the way as described herein.  The code's entire purpose is to monetize data about STIIIZY's customers, and there can be no doubt that the code on the Website collects personal and health information and transmits it to third-party advertisers.

80.    By repackaging and selling information about consumer cannabis usage and purchase, STIIIZY violates reasonable consumer expectations for how STIIIZY will treat sensitive medical information.

81.    Under Cal. Civ. Code § 56.10(a), "[p]atient records are confidential and must not be disclosed without the consent of the patient or his or her legal representative," subject only to narrow exceptions for treatment, oversight, or specific court orders.

82.    The California Confidentiality of Medical Information Act ("CMIA") provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care

or an enrollee or subscriber of a health care service plan without first obtaining an authorization," subject only to narrow exceptions for treatment, legal process, or specific statutory purposes. Cal. Civ. Code § 56.10(a). The CMIA defines "medical information" broadly to include "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(j).

83.  The CMIA further restricts the use of medical information for commercial purposes. Any provider, plan, or contractor that uses or discloses medical information for direct marketing must first obtain a written authorization that is signed and dated by the patient, states the specific uses and disclosures authorized, and satisfies additional formality requirements designed to ensure knowing consent. Cal. Civ. Code § 56.101. These provisions underscore the Legislature's recognition that commercial exploitation of health data—including disclosure to advertising platforms—is categorically prohibited absent express patient authorization.

84.  Violations of the CMIA carry significant penalties: a patient may recover nominal damages of $1,000 per negligent violation, actual damages, and administrative penalties of up to $25,000 for willful violations. Cal. Civ. Code § 56.36. These statutory commands reflect California's broader public policy that health-related records are private by default and that disclosures to unauthorized third parties are both improper and legally restricted.

85.  Even more to the point, the California Legislature has made unmistakably clear that cannabis users have a strong expectation of privacy. California was the first state to enact medical cannabis legislation, and its statutory framework reflects consistent legislative recognition that cannabis patients face unique privacy concerns. The Compassionate Use Act of 1996 declared that medical

21

cannabis patients and their caregivers should "not be subject to criminal prosecution or sanction" for using cannabis on a physician's recommendation. Cal. Health & Safety Code § 11362.5(b)(1)(B). Subsequent legislation established a voluntary identification card program—voluntary precisely because the Legislature recognized that requiring registration would deter patients from seeking lawful treatment due to privacy and stigma concerns. *See* Cal. Health & Safety Code § 11362.71 *et seq*.

86.    California law further provides that information identifying the names of patients, their medical conditions, or the names of their primary caregivers in records kept by state licensing authorities "are confidential and shall not be disclosed pursuant to the California Public Records Act." Cal. Bus. & Prof. Code § 26162. This exemption reflects the Legislature's recognition that disclosure of cannabis patient information poses real risks of harm. As researchers have documented, medical cannabis patients face significant stigma that can affect their "employment, housing, and social relationships," leading many to actively conceal their patient status to avoid discrimination.[28]

87.    The Legislature has gone further still by expressly classifying cannabis patient information as "medical information" subject to CMIA's full protection. Cal. Health & Safety Code § 11362.713 provides that identifying information regarding cannabis patients—including their medical conditions—maintained in state and county public health records "are hereby deemed 'medical information' within the meaning of the Confidentiality of Medical Information Act" and may not be disclosed except in compliance with CMIA's stringent restrictions. Although §

---

[28] *See* Satterlund *et al.*, *Stigma Among California's Medical Marijuana Patients*, 11 J. Psychoactive Drugs 45 (2015).

11362.713 applies to government-held records, it reflects an unmistakable legislative judgment that cannabis health data commands the same legal protection as any other sensitive medical information—a judgment that informs the reasonable expectations of privacy that cannabis consumers bring to their interactions with cannabis retailers.

88.    This expectation of privacy exists even though the California Department of Public Health maintains a Medical Marijuana Identification Card Program. The purpose of that registry is to allow law enforcement to verify that a patient or caregiver is authorized to possess cannabis—not to facilitate disclosure of patient information to third parties. Indeed, the program's enabling legislation emphasizes that patient participation is "wholly voluntary," and a patient need not possess an identification card to claim the protections of the Compassionate Use Act. *See* Cal. Health & Safety Code § 11362.71(f).

89.    Finally, California law imposes a direct prohibition on cannabis licensees' disclosure of consumer health information. Public licensing records indicate that STIIIZY conducts cannabis operations through several entities holding state licenses under Division 10. Those entities are "licensee[s]" within the meaning of Business and Professions Code § 26001(aj). Section 26161.5 prohibits a licensee from disclosing a consumer's personal information to any third party absent consumer consent. Cal. Bus. & Prof. Code § 26161.5(a). For customers holding a physician's recommendation, a name combined with cannabis purchase history constitutes "personal information" in that it reflects "medical treatment or diagnosis by a health care professional" within the meaning of Civil Code § 1798.81.5(d)(1)(A)(iv), (d)(2). As set forth above, STIIIZY failed to obtain consumer consent, and each such transmission of customer data to a third-party ad-tech platform therefore violated § 26161.5.

90.    As discussed herein, a cannabis consumer's medical information and

23

purchasing history are protected under California law, and consumers reasonably expect that their use, purchase, and treatment using cannabis will not be disclosed except in limited circumstances—and certainly not broadcast to third-party advertisers. This distinguishes a cannabis patient's private medical choices from activities that are openly visible to the public.

91. A STIIIZY customer who interacts with the STIIIZY Website to seek products for a present or future healthcare need has a reasonable expectation of privacy under California law for their cannabis use and purchasing information.

**E. Consumer Harm**

92. Plaintiffs and Class members were harmed when STIIIZY invaded their privacy rights by capturing and disclosing data about their marijuana consumption, including cannabis consumption, to third parties without consent. Reasonable consumers, including Plaintiffs, would not have used the STIIIZY Website had they known that their privacy rights would be violated as a result.

93. STIIIZY's uniform representation across all three versions of its Privacy Policy that it does not "sell" consumers' personal information was false, or at minimum materially misleading, for the reasons set forth below.

94. For example, the cookie-sync exchange between STIIIZY's Website and Lotame's Panorama ID system is far from a passive or incidental data transfer. Vendors like Lotame are not "service providers, affiliates, and contractors" performing functions on STIIIZY's behalf, as STIIIZY's Privacy Policies represented were the only third parties receiving consumer data. They are commercial operators of data marketplaces and identity networks whose business model depends on aggregating, enriching, and reselling the consumer behavioral signals that website operators like STIIIZY contribute to their ecosystems—with or without those consumers' knowledge or consent.

24

95. The STIIIZY-Lotame deal is therefore a bilateral commercial exchange: the user's browser transmits STIIIZY's local cookie identifier to Lotame; Lotame returns its persistent Panorama ID; both parties now share a linkable key that enables Lotame to merge STIIIZY's cannabis behavioral data with profiles Lotame has assembled from other sources across the internet and to make those enriched profiles available to buyers in the LDX marketplace.

96. The enrichment is bidirectional. The cookie-sync did not merely allow Lotame to receive STIIIZY's customer data; it also caused Lotame's existing demographic and interest data about the user—assembled from across Lotame's network of publishers—to be added to the visitor's advertising profile. This bidirectional enrichment is the hallmark of a data marketplace arrangement, not a service-provider relationship, and takes Lotame's receipt and use of STIIIZY's customer data outside any legitimate "service provider" or "contractor" carve-out under STIIIZY's privacy representations or any applicable privacy law.

97. Lotame's own published materials confirm the commercial character of this arrangement. Lotame describes LDX as offering clients "an additional revenue stream by monetizing their data" and states that "[a] signed agreement is required for Lotame to contribute a client's data into our data exchange."[29] The most plausible inference from the cookie-sync mechanism, the bidirectional enrichment, and Lotame's public statements as to its commercial structure is that STIIIZY received value in exchange for permitting Lotame to harvest its customers' cannabis behavioral signals, in direct contravention of its uniform representation that it did not sell personal information.

[29] Chris Hogg, *Did You Know: Selling Your Data Through the Lotame Data Exchange*, Lotame (Dec. 7, 2023), https://www.lotame.com/resources/selling-your-data/.

98. These omissions were material. A reasonable cannabis consumer who read any version of STIIIZY's Privacy Policy and relied on its representation that STIIIZY did not sell personal information would not have understood that visiting STIIIZY's Website would cause their cannabis-related browsing and purchasing behavior to be transmitted and made available for purchase by an unlimited number of unknown third-party buyers across unrelated websites, social media platforms, and mobile applications—in perpetuity.

99. STIIIZY's contractual representations aside, personal and health information tied to cannabis use is extremely valuable.

100. There is a huge market for health data like the data disclosed to STIIIZY on its website. Plaintiffs and Class members suffered pecuniary losses when STIIIZY sold and resold their data to third parties because of the value of the data itself. Without the freedom to control what becomes of their data, STIIIZY website users are unable to maintain the value of their personal data and use it for whatever purposes they please (or for no purpose other than for health treatment, if they so choose).

101. The value of consumers' personal and health information is axiomatic. When cybercriminals steal such information, like the information STIIIZY sold to its third-party business partners, the criminals face huge fines and lengthy prison sentences. Organizations across every sector use and monetize consumer data to increase profits.

102. And the value of such information as a commodity is measurable. As stated in "Exploring the Economics of Personal Data," "[f]irms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks." Consumer personal information is so valuable to identity thieves that once PII and PHI has been disclosed, criminals often trade it on the "cyber black-market," or the

26

"dark web," for many years. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data.[30] That figure is only due to keep increasing.

103.  There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services."). Google has recognized the value of user data and even instituted a pilot program to pay users $3 per week to allow Google to track them online.[31]

104.  Several companies have products through which they pay consumers for a license to track their data. Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information. Facebook also has paid users for their digital information, including browsing history. Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

---

[30] *See* Robert J. Shapiro, *What Your Data is Really Worth to Facebook*, Washington Monthly (July 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook (last accessed Apr. 20, 2026).

[31] *See* Josh Sidorowicz, *Yes, Google will pay you to track what you do on your phone*, WTSP Tampa Bay 10 (Apr. 11, 2024), https://www.wtsp.com/article/news/verify/google-tracking-study-payment-verify/67-1cc2e9a3-f51b-489b-aef8-1477201c0c11 (last accessed Apr. 16, 2026).

105. Meanwhile, consumers "have good reason to worry about data security" according to law firm Foley Hoag.[32] Cybercriminals have successfully targeted cannabis databases on multiple occasions, including major breaches in 2016 (Washington State Liquor and Cannabis Board and the Nevada Division of Public and Behavioral Health) and 2017 (a compliance system called MJ Freeway, which is used by medical dispensaries across the country in over 1000 different dispensaries).[33] According to Foley:

> When it comes to privacy, marijuana is different both as a product and as a medical treatment. While patient information of any kind must be safeguarded, there is a special sensitivity about marijuana use. Stigma about cannabis, as well as fears about federal oversi[ght], make marijuana-related data especially vulnerable to breaches. This sensitivity extends to the recreational marijuana industry. Few people look over their shoulder walking into a liquor store, but many customers think twice before walking into a dispensary. People are worried about data falling into the hands of the federal government, but also of their employers.
>
> …
>
> Right now, the needs of consumers and companies seem to be at odds – consumers want less data collection, while tech companies and investors want more.[34]

106. As the cannabis industry continues to grow in the United States, so too are the desires of the advertising industry to profit off the data that accompanies demographic and personal information, as well as consumer interest and consumer purchases.

---

[32] *Marijuana and Privacy: A Primer* (March 22, 2017), https://foleyhoag.com/news-and-insights/blogs/cannabis-and-the-law/2017/march/marijuana-and-privacy-a-primer/, (last accessed May 6, 2026).

[33] *Id.*

[34] *Id.*

107.    These harms are not hypothetical or speculative—they are precisely the types of injuries California law has long sought to prevent. The California Legislature enacted robust confidentiality protections for medical marijuana patient information, making such records exempt from the California Public Records Act. Cal. Health & Safety Code § 11362.5; AB 266 (2015). California courts and scholars have long recognized that marijuana patients face stigma that can affect their employment, housing, social relationships, and standing in their communities—a reality underscored by the Legislature's decision to make the state's medical marijuana identification card program entirely voluntary.

108.    These harms stem from the enduring stigma that surrounds marijuana use—even when recommended for medical purposes—and reflect the Legislature's judgment that such information deserves the same confidentiality protections afforded other sensitive medical information under the CMIA. Studies of medical marijuana patients in California have documented that patients actively attempt to conceal their status to avoid discrimination and social harm, and that such stigma represents a significant barrier to seeking treatment.

109.    California's statutory framework confirms what common sense already dictates: when a patient lawfully seeks marijuana-based treatment, disclosing that fact to unauthorized third parties is not benign—it is a disclosure that invites reputational harm, bias, and targeting. The Legislature recognized this reality by classifying patient identification information as confidential and by providing civil penalties of up to $25,000 for willful violations of medical information privacy. Cal. Civ. Code § 56.36. STIIIZY's actions exposed its customers to precisely these harms.

110.    These harms stem from the enduring stigma that surrounds marijuana use—even when prescribed for medical or recreational purposes—and reflect the Legislature's judgment that disclosing such information poses real threats to a

29

person's dignity, safety, employment, and social standing.

111. Further, STIIIZY's customers reasonably expect, based on their expectation of privacy in their healthcare treatment, that STIIIZY will safeguard their private information and not sell it to third parties. They reasonably believe and expect that at least some part of the consideration (pecuniary and otherwise) they are spending for a private transaction will, in fact, be used to ensure the privacy of the transaction.

## F.     Plaintiffs' Experience

### *Plaintiff A.G.*

112. Plaintiff A.G. is a citizen of the State of California. At all times relevant to this action, Plaintiff A.G. resided in Los Angeles County, California.

113. Plaintiff A.G. is a frequent and regular STIIIZY customer. Beginning in approximately May or June 2024, Plaintiff A.G. began visiting STIIIZY's Website to browse and purchase cannabis products. Since that time, Plaintiff A.G. has purchased cannabis products from STIIIZY approximately ten to twenty times per month.

114. In the course of browsing and making purchases on STIIIZY's Website, Plaintiff A.G. provided personal information to STIIIZY, including his name, email address, phone number, physical address, payment information, and detailed cannabis purchase history. Plaintiff A.G.'s browsing activity on STIIIZY.com—including the specific cannabis products he viewed, added to his cart, and purchased—was captured by the third-party tracking technologies embedded on STIIIZY's Website and transmitted to third-party advertising platforms including Meta (Facebook), Google, and others.

115. Plaintiff A.G. maintains an active Facebook account. After using STIIIZY's Website, Plaintiff A.G. noticed a significant and sustained increase in cannabis-related advertisements appearing in his Facebook feed. These targeted

30

advertisements reminded Plaintiff A.G. to purchase more cannabis products and appeared with such frequency and specificity that Plaintiff A.G. understood his browsing activity on STIIIZY's Website had been shared with Facebook for advertising purposes. Plaintiff A.G. did not consent to this sharing of his sensitive cannabis-related browsing and purchase activity with Facebook or any other third-party advertising platform.

116.    Plaintiff A.G. had no reason to believe that visiting a cannabis dispensary's website to make lawful purchases would result in his cannabis usage being disclosed to social media companies and advertising networks. Had Plaintiff A.G. known that STIIIZY was sharing his browsing activity and purchase history with third-party advertisers, he would not have used STIIIZY's Website or would have taken steps to prevent such tracking.

*Plaintiff B.R.*

117.    Plaintiff B.R. is a citizen of the State of California residing in Los Angeles County.

118.    Plaintiff B.R. has been a STIIIZY customer since approximately 2023. Plaintiff B.R. regularly visited STIIIZY's Website to browse cannabis products, research product information, and prepare for in-store purchases. On multiple occasions, Plaintiff B.R. has used STIIIZY's Website to build a virtual shopping cart—selecting specific cannabis products and adding them to her online "bag"—before visiting a STIIIZY retail location to complete her purchase in person.

119.    Plaintiff B.R.'s pattern of use demonstrates how STIIIZY's tracking technologies capture sensitive information even when a customer does not complete an online transaction. By browsing products, adding items to her cart, and navigating through STIIIZY's Website, Plaintiff B.R.'s cannabis interests, product preferences, and shopping behavior were captured by the third-party tracking pixels embedded on STIIIZY.com and transmitted to advertising platforms including Meta

31

(Facebook) and Google—regardless of whether she ultimately entered payment information or completed a purchase online.

120.   Plaintiff B.R. maintains an active Facebook account. After using STIIIZY's Website, Plaintiff B.R. noticed a marked increase in cannabis-related targeted advertisements appearing on her social media platforms. The timing and specificity of these advertisements confirmed to Plaintiff B.R. that her browsing activity on STIIIZY's Website—including the products she viewed and added to her cart—had been intercepted and shared with third-party advertisers without her knowledge or consent.

121.   Plaintiff B.R. did not consent to STIIIZY's disclosure of her cannabis browsing activity to Facebook, Google, or any other third-party advertising platform. Plaintiff B.R. had no expectation that her private browsing of cannabis products would be monitored by third parties and used to target her with advertisements across the internet.

*Plaintiff R.M.*

122.   Plaintiff R.M. is a citizen of the State of California residing in Napa County. Plaintiff R.M. has resided in California for approximately twelve years.

123.   Plaintiff R.M. is a licensed cannabis patient who holds a valid California cannabis card. On June 4, 2024, Plaintiff R.M. visited STIIIZY's Website and made a purchase of a vape battery product. In connection with this purchase, Plaintiff R.M. provided personal information to STIIIZY, including his name, email address, phone number, physical address, and payment information.

124.   Plaintiff R.M. maintains a Facebook account that he has used since 2009. Following his June 4, 2024 purchase on STIIIZY's Website, Plaintiff R.M. experienced a substantial and noticeable increase in cannabis-related advertisements appearing on his Facebook feed. The volume and targeting of these cannabis advertisements increased dramatically after his single interaction with

STIIIZY's Website, demonstrating that his browsing activity and purchase information had been transmitted to Facebook's advertising platform.

125. As a licensed cannabis patient, Plaintiff R.M. is particularly sensitive to the disclosure of his cannabis usage to third parties. Plaintiff R.M.'s decision to obtain a cannabis card and purchase cannabis products through legal channels was a private health decision. Plaintiff R.M. did not consent to STIIIZY sharing information about his cannabis purchases with Facebook, Google, or any other third-party advertising platform. Had Plaintiff R.M. known that his purchase activity would be shared with social media companies, he would have sought alternative means to obtain cannabis products or would have taken steps to prevent such tracking.

## CHOICE OF LAW ALLEGATIONS

126. California's substantive law may be applied to every Plaintiff and Class member without offending the Due Process Clause (U.S. Const. amend. XIV, § 1) or the Full Faith and Credit Clause (U.S. Const. art. IV, § 1). California has extensive contacts—and, indeed, is the center of gravity—for the conduct challenged in this action, giving the State a paramount interest in having its law govern and ensuring the choice of California law is neither arbitrary nor unfair.

127. STIIIZY is incorporated under California law and maintains its principal place of business at 728 E Commercial St, Floor 2, Los Angeles, CA 90012. From that headquarters STIIIZY directs the design and operation of its website and the tracking technologies that give rise to Plaintiffs' claims. STIIIZY also operates more dispensaries, employs more personnel, and earns more revenue in California than in any other state. These deliberate California contacts are more than sufficient to make application of California law constitutionally permissible.

128. All material corporate decisions concerning STIIIZY's data-collection

33

and advertising practices were conceived, approved, and implemented in California. The servers, marketing personnel, compliance staff, and information-technology teams that configure the challenged pixels, cookies, and software development kits are based principally in California. Accordingly, the wrongful interceptions and disclosures alleged herein emanated from within California's borders—even when a consumer accessed STIIIZY's site from another state.

129. California's choice-of-law rules likewise point to California. Under California's "most significant relationship" test, the place where the tortious conduct occurred and where Defendant is headquartered carry particular weight. Both factors favor application of California law to the nationwide class.

130. Further, California has a uniquely strong regulatory interest in the privacy of medical-marijuana patients. Its legislature has expressly declared that disclosure of a patient's cannabis-use information "could be used to embarrass, humiliate, harass, or discriminate against the patient." Cal. Health & Safety Code § 11362.5 (public-necessity statement). Applying California law furthers that interest uniformly for every class member whose sensitive data was monetized by a California-based cannabis company.

131. Because STIIIZY purposely availed itself of California law, and because the gravamen of Plaintiffs' claims arises from decisions and conduct centered in California, California has a far greater interest in regulating this conduct than any other jurisdiction. California law therefore governs the claims of all Class members.

## TOLLING

132. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs did not know (and had no way of knowing) that their personal and health information was intercepted, unlawfully disclosed, or sold to

34

third parties because STIIIZY kept this information secret. STIIIZY also concealed its data-sharing practices by making false representations to the contrary.

## CLASS ALLEGATIONS

133. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Nationwide Class:

> All natural persons in states where cannabis is legal for medical or recreational use who used the STIIIZY Website and/or mobile application and whose communications and/or personal data were shared with third parties such as Facebook, Google, and Lotame.

134. In addition, or, as where noted *infra*, in the alternative, Plaintiffs bring this action on behalf of the following Nationwide Medical Sub-Class:

> All natural persons who, for medicinal cannabis purposes, used the STIIIZY Website and/or mobile application and whose communications and/or personal data were shared with third parties such as Facebook, Google, and Lotame.

135. Plaintiffs also bring this action on behalf of the following California Sub-Class:

> All California residents who used the STIIIZY Website and/or mobile application and whose communications and/or personal data were shared with third parties such as Facebook, Google, and Lotame.

136. Together, the Nationwide Class, Nationwide Medical Sub-Class, and the California Sub-Class are referred to as the Class. Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

137. *Numerosity*. The exact number of members of the Class is unknown

35

and unavailable to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals, and the members can be identified through Defendant's records.

138. *Predominant Common Questions*. The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendant violated Plaintiffs' and Class members' privacy rights;

b. Whether Defendant was unjustly enriched;

c. Whether Defendant's acts and practices violated state consumer protection laws;

d. Whether Plaintiffs and the Class are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement; and,

e. Whether Plaintiffs and the Class are entitled to actual, statutory, punitive and/or other forms of damages, and other monetary relief.

139. *Typicality*. Plaintiffs' claims are typical of the claims of the other members of the Class, and these claims arise from the same conduct by Defendant and are based on the same legal theories.

140. *Adequate Representation*. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiffs have no interest that is antagonistic to the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do

36

so. Neither Plaintiffs nor their counsel have any interest adverse to the interests of the other members of the Class.

141. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

142. Plaintiffs may revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

### FIRST CAUSE OF ACTION
### BREACH OF CONFIDENCE
### *(On behalf of Plaintiffs & the Medical Sub-Class)*

143. Plaintiffs re-allege and incorporate paragraphs 1 through 142 with the same force and effect as if fully restated herein.

144. Providers of healthcare, including those that dispense prescription or physician-certified medication, have a duty to their patients to keep non-public medical information completely confidential.

145. A physician's recommendation or certification that a person use marijuana for a medical purpose, and that person's purchase and use of marijuana for that purpose, is medical and health information.

146. Plaintiffs and the Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on its Website.

147. This expectation is rooted in the traditional confidentiality of the

37

physician-patient relationship and the widespread legal protections for medical privacy, including under the California Constitution and California statutes explicitly protecting patient records. Cal. Civ. Code § 56.10(a); Cal. Civ. Code § 56.10(d).

148. Even more to the point, the California Legislature has made it unmistakably clear that cannabis users have a strong expectation of privacy. California law exempts a cannabis user's personal information from California's broad Public Records Act. Cal. Health & Safety Code § 11362.5. California's constitution requires a public necessity statement in order to exempt information from public disclosure under California's Public Records Act. Cal. Const. Art. I, § 1. And California's Business and Professions Code § 26161.5 imposes a sector-specific prohibition on cannabis licensees' disclosure of consumer personal information to third parties absent consent.

149. Contrary to its duties as a provider of healthcare, STIIIZY installed tracking technologies to disclose and transmit Plaintiffs' and the Class Members' communications, including personal health information, to unauthorized third parties. These disclosures were made without Plaintiffs' or the Class Members' knowledge, consent, or authorization, and were unprivileged.

150. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

151. As a direct and proximate cause of Defendant's unauthorized disclosures of patient personally identifiable, non-public medical information and communications, Plaintiffs and the Class Members were damaged. Specifically, STIIIZY's breach of confidence of the Plaintiffs and the Class Members damaged Plaintiffs and the Class Members in that:

    a. Sensitive and confidential medical information that Plaintiffs and the

Class Members intended to remain private is no longer private;

b. Plaintiffs and the Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. Plaintiffs' and the Class Members' rights were violated by Defendant, entitling them to damages in an amount to be determined at trial;

e. Plaintiffs and the Class Members are entitled to nominal damages for each independent violation;

f. Defendant took something of value from Plaintiffs and the Class Members and derived benefit therefrom without their knowledge or informed consent and without compensation for such data;

g. Plaintiffs and the Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

h. Defendant's actions diminished the value of Plaintiffs' and the Class Members' personal health information.

152. Plaintiffs and Class members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of STIIIZY's actions, directed at injuring Plaintiffs and Class members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

153. Plaintiffs also seek such other relief as the Court may deem just and proper.

**SECOND CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
*(On behalf of Plaintiffs & the Nationwide Class or, in the alternative, the Medical Sub-Class)*

154. Plaintiffs re-allege and incorporate paragraphs 1 through 142 with the

39

same force and effect as if fully restated herein.

155.  As a condition of using STIIIZY's Website and purchasing cannabis products, Plaintiffs and Class members provided STIIIZY with their personal and health information—including full legal name, email address, phone number, physical address, payment information, IP address, geolocation data, and detailed cannabis purchase history—and paid consideration for STIIIZY's goods and services. In so doing, Plaintiffs and Class members entered into express contracts with STIIIZY, the material terms of which were set forth in STIIIZY's Privacy Policies.

156.  STIIIZY's Privacy Policies, operative throughout the Class Period, made uniform and affirmative representations that formed the express terms of those contracts. The 2019 Policy promised: "We do not sell, trade, or otherwise transfer to outside parties your Personally Identifiable Information unless we provide users with advance notice." The 2023 Policy represented, across every category of personal information in its disclosure table: "We do not sell this information," and further represented that sensitive personal information—including health information such as medical marijuana cards and doctor recommendations—would be shared only with "[s]ervice providers, affiliates, and contractors with whom we do business." The 2025 Policy likewise represented: "We do not sell your personal information." Each version further represented that STIIIZY "strive[s] to only collect and use personal information that we need." These representations were made uniformly to every user who visited the Website during the Class Period and were sufficiently definite to constitute enforceable contractual commitments.

157.  Plaintiffs and Class members fully performed their obligations under these contracts. They provided their personal and health information as required and paid for STIIIZY's goods and services.

158.  STIIIZY materially breached these express contractual commitments in

40

at least the following respects. First, STIIIZY sold, transferred, and disclosed Plaintiffs' and Class members' personal information to several third-party advertising platforms—including Meta, Google, and Lotame—without providing the advance notice its 2019 Policy promised and in direct contradiction of its uniform representation that it did not sell personal information.

159. Second, STIIIZY transmitted customer data to entities that were not "service providers, affiliates, and contractors" performing functions on STIIIZY's behalf, but commercial data-marketplace operators—including Lotame, which by its own description offers clients "an additional revenue stream by monetizing their data" through its global data exchange—whose business model is the aggregation, enrichment, and resale of the consumer behavioral signals they receive.

160. Third, STIIIZY collected and transmitted far more personal information than it represented was necessary, including persistent device identifiers, precise geolocation coordinates, real-time behavioral signals, and cannabis purchase details, in breach of its representation that it collected only what it needed.

161. Fourth, throughout the Class Period, STIIIZY failed to disclose by name any of the platforms actually receiving customer data—including Meta, Lotame, and others—identifying only Google Analytics in any version of its Privacy Policy while several platforms operated data-collection technology on its Website.

162. Members of the Medical Sub-Class—those who accessed the Website for medicinal cannabis purposes—are entitled to raise an additional and independent theory of breach rooted in the implied expectation of confidentiality that attaches to medical information. When a customer seeks cannabis pursuant to a medical need, the transaction carries the same confidentiality expectations as any other medical encounter—expectations deeply embedded in California law and the physician-patient relationship. The Medical Sub-Class therefore suffered a breach

41

independent of and more fundamental than the general data-sale allegations: the betrayal of a confidentiality obligation that the law implies into every medical relationship.

163. As a direct and proximate result of STIIIZY's breaches, Plaintiffs and Class members suffered damages including: the loss of the benefit of their bargain—the privacy protection they paid for and did not receive; the diminution in value of their personal and health information; exposure to unwanted targeted advertising publicly signaling their cannabis use; and the other harms described above. Plaintiffs and Class members are entitled to recover actual, compensatory, consequential, and nominal damages, together with such other relief as the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
*(On behalf of Plaintiffs & the Nationwide Class or, in the alternative, the Medical Sub-Class)*

164. Plaintiffs re-allege and incorporate paragraphs 1 through 142 with the same force and effect as if fully restated herein.

165. This count is brought in the alternative to Plaintiffs' count for breach of express contract.

166. By accessing STIIIZY's Website and browsing and purchasing products, Plaintiffs and Class members each respectively entered into an implied contract with STIIIZY in which STIIIZY agreed to safeguard the personal health information provided by Plaintiffs and the Class Members to STIIIZY during their cannabis purchasing activities.

167. Plaintiffs' and the Class Members' provision of this sensitive and precious information to STIIIZY, and STIIIZY's receipt of the same, created an implied promise on the part of STIIIZY to treat such information in accordance with typical expectations surrounding medical information generally. Consumers seeking

42

medical care, including through cannabis, have a reasonable expectation of privacy in their health information. Plaintiffs and the Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on its Website.

168. This expectation is rooted in the traditional confidentiality of the physician-patient relationship and the widespread legal protections for medical privacy, including under the California Constitution and California statutes explicitly protecting patient records. Cal. Civ. Code § 56.10(a); Cal. Civ. Code § 56.10(d).

169. Even more to the point, the California Legislature has made it unmistakably clear that cannabis users have a strong expectation of privacy. California law exempts a cannabis user's personal information from California's broad Public Records Act. Cal. Health & Safety Code § 11362.5. California's constitution requires a public necessity statement in order to exempt information from public disclosure under California's Public Records Act. Cal. Const. Art. I, § 1. And California's Business and Professions Code § 26161.5 imposes a sector-specific prohibition on cannabis licensees' disclosure of consumer personal information to third parties absent consent.

170. The existence of a Privacy Policy is further evidence of the implied contract between Plaintiffs and the Class members, on the one hand, and STIIIZY, on the other. There would be no purpose for a privacy policy if the expectation that STIIIZY maintain consumer privacy were unfounded or unreasonable.

171. Members of the Medical Sub-Class—those who accessed the Website for medicinal cannabis purposes—are entitled to raise an additional and independent theory of breach rooted in the implied expectation of confidentiality that attaches to medical information. When a customer seeks cannabis pursuant to a medical need, the transaction carries the same confidentiality expectations as any

43

other medical encounter—expectations deeply embedded in California law and the physician-patient relationship. The Medical Sub-Class therefore suffered a breach independent of and more fundamental than the general data-sale allegations: the betrayal of a confidentiality obligation that the law implies into every medical relationship.

172. Plaintiffs and Class members had a reasonable expectation that STIIIZY would keep their personal and health information confidential as no language in STIIIZY's Privacy Policy makes it clear to a user that their personal and health information would not be kept confidential, except in limited circumstances clearly outlined by STIIIZY. Additionally, Plaintiffs and Class members reasonably believed that STIIIZY would use part of the monies paid to STIIIZY in order to keep their personal and health information confidential. This reasonable belief was rooted in the reasonable expectation of privacy that consumers have over their medical information.

173. Plaintiffs and Class members would not have provided nor entrusted STIIIZY with their personal and health information or would have paid less for its goods and services, had they known that STIIIZY had no intention of keeping this implied contract.

174. STIIIZY breached its implied contracts with Plaintiffs and the Class Members by disclosing their private information to unauthorized parties. As a direct and proximate result of STIIIZY's breach of implied contract, Plaintiffs and Class members sustained actual losses and damages as described in detail above, including that they did not get the benefit of their bargain for which they paid and were overcharged by STIIIZY for its services.

175. Plaintiffs and Class members request all forms of damages with respect to these breaches of implied contract, including nominal damages.

**FOURTH CAUSE OF ACTION**
**UNJUST ENRICHMENT/QUASI CONTRCAT/RESTITUTION**

44

***(On behalf of Plaintiffs & the Nationwide Class)***

176. Plaintiffs re-allege and incorporate paragraphs 1 through 142 with the same force and effect as if fully restated herein.

177. This cause of action is pled in the alternative to the breach of implied contract cause of action.

178. Defendant received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense. Specifically, Plaintiffs conferred a direct economic benefit on STIIIZY by paying for cannabis products and services. Embedded in that transaction was an implicit commitment that customer personal information would be handled in accordance with applicable law and would not be sold or disclosed to third parties. Plaintiffs did not receive the benefit of that commitment. STIIIZY simultaneously collected the purchase price from Plaintiffs and monetized their personal information through undisclosed disclosures to advertising networks—including Lotame, from which STIIIZY derived "an additional revenue stream by monetizing [customer] data"—retaining the value of both.

179. Defendant received benefits from Plaintiffs and Class members in the form of the Plaintiffs' highly valuable data, including health information and personal information, that Defendant wrongfully disclosed and intercepted from Plaintiffs and Class members without authorization and proper compensation.

180. Defendant disclosed, intercepted, stored, and used this data for its own gain, providing Defendant with economic, intangible, and other benefits, including highly valuable data for analytics, advertising, and improvement of its platforms, algorithms, and advertising services.

181. Had Plaintiffs known of Defendant's misconduct, they would not have provided any of their valuable data to Defendant or have used or paid to use the STIIIZY Website.

182. Defendant unjustly retained these benefits at the expense of Plaintiffs and Class members because Defendant's conduct damaged Plaintiffs and Class members, all without providing any commensurate compensation to Plaintiffs and Class members.

183. The benefits that STIIIZY derived from Plaintiffs and Class members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in every state for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

184. Defendant should be compelled to disgorge profits into a common fund for the benefit of Plaintiffs and Class members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**FIFTH CAUSE OF ACTION**
**CALIFORNIA INVASION OF PRIVACY ACT, Cal. Penal Code § 631**
*(On behalf of Plaintiffs & the California Sub-Class)*

185. Plaintiffs repeat and reallege paragraphs 1 through 142 as if fully set forth herein.

186. California law, including the California Invasion of Privacy Act, applies to the claims of Plaintiffs and the Class.

187. California Penal Code § 631(a) makes it unlawful for any person to, by means of any machine, instrument, or contrivance, intentionally tap, or make any unauthorized connection with any telegraph or telephone wire, line, cable, or instrument, or to willfully and without the consent of all parties to the communication read, or attempt to read, or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any such wire, line, or cable, or is being sent from, or received at any place within this state.

188. Section 631(a) further prohibits the "use," "disclosure," or any endeavor to use or disclose the contents of such intercepted communications.

189. CIPA creates a civil cause of action for private litigants:

Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of Cal. Penal Code §§ 631-632.7 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate, including:

(b) Actual damages, but not less than liquidated damages, computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(c) Punitive damages; and

(d) A reasonable attorney's fee and other litigation costs reasonably incurred.

Cal. Penal Code § 637.2(a).

190. CIPA was designed to protect private medical information. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778 (N.D. Cal. 2022).

191. As a corporation, STIIIZY is a "person or entity" under CIPA.

192. The data packets transmitted between a STIIIZY account holder's device and STIIIZY's servers while the user browses or purchases products on STIIIZY's Website constitute a "wire, oral or electronic communication" within the meaning of Cal. Penal Code § 631. These packets captured and transmitted information such as full name, email address, IP address, information about marijuana purchases and activity, physical location, customer_id, persistent device IDs, keystrokes and other regulated-use details, contact and device coordinates, scroll depth, and behavior and transactional context details like mouse movements and keystrokes. This information constitutes protected health information as well as the substance, import, and meaning of communications between Plaintiffs and the Class Members, on the one hand, and STIIIZY, on the other.

193.  The third-party tracking pixels, cookies, and other code that STIIIZY embeds (or permits to be embedded) on its site constitute a "machine, instrument, or contrivance" used to tap or make an unauthorized connection with a wire, line, or cable within the meaning of Section 631(a).

194.  By installing, configuring, and directing the operation of those tracking technologies, STIIIZY intentionally tapped and made unauthorized connections with Plaintiffs' and Class members' communications with STIIIZY, and willfully read and learned the contents of those communications while in transit, without securing the prior consent of all parties to those communications. Because of STIIIZY's tracking technologies, which STIIIZY intentionally embedded on its website, Plaintiffs' and the Class Members' electronic communications were intercepted, recorded, and transmitted to unauthorized third parties during the communication and without the knowledge, authorization, or consent of Plaintiffs and the Class Members.

195.  Plaintiffs' and Class Members' electronic communications are intercepted in real time, contemporaneously with their transmission.

196.  STIIIZY further endeavors to and does in fact "disclose" and "use" such intercepted communications for its own benefit—transmitting them to scores of advertising-technology companies—in further violation of Penal Code § 631(a).

197.  Independently of any direct violation by STIIIZY, the third-party recipients identified above—including Meta, Google, and Lotame (collectively, the "Third-Party Interceptors")—each willfully read or learned the contents of Plaintiffs' and Class members' electronic communications with STIIIZY.com while those communications were in transit. Each Third-Party Interceptor is an independent commercial entity that is not a party to those communications, and each used or attempted to use, read or learn the information so obtained for its own commercial purposes—including bidirectional enrichment of the user's advertising

48

profile with data collected from other sources, cross-site and cross-device user identification, sale of audience segments to third-party buyers, and scoring and bidding in programmatic ad auctions—in violation of Cal. Penal Code § 631(a).

198. STIIIZY aided, agreed with, employed, conspired with, and procured each Third-Party Interceptor to commit those violations within the meaning of § 631(a), by affirmatively embedding each tracker on STIIIZY.com, configuring it to transmit specific data fields to specific third-party endpoints, maintaining commercial relationships with each recipient for the mutual exchange of value, and concealing the scope of those arrangements from Plaintiffs and Class members.

199. Plaintiffs and each Class member are "aggrieved persons" because their private electronic communications were intercepted, disclosed, and used without consent.

200. STIIIZY's interceptions were knowing and intentional, undertaken to monetize sensitive medical-usage data for its own commercial gain. Such conduct warrants the full measure of statutory, actual, and punitive relief authorized by the California Legislature.

201. STIIIZY's conduct is ongoing and continues to result in the unlawful interception of Plaintiffs' and Class members' communications each time they access STIIIZY's Website, including password-protected areas, without their knowledge or consent. Plaintiffs and Class members are entitled to declaratory and injunctive relief to prevent further interceptions, to require STIIIZY to fully disclose its use of tracking technologies and data-sharing practices, and to mandate that STIIIZY obtain users' express, informed consent before intercepting or disclosing their interactions and communications on its digital platforms.

202. Plaintiffs therefore, on behalf of themselves and the Class, seek all relief authorized under Cal. Penal Code § 637.2, including preliminary and equitable relief such as an injunction prohibiting further interceptions; $5,000 in

49

statutory damages per plaintiff per violation or three times the actual damages, if any, sustained by the plaintiff; punitive damages; and an award of reasonable attorneys' fees and litigation costs.

**SIXTH CAUSE OF ACTION**
**CALIFORNIA INVASION OF PRIVACY ACT, Cal. Penal Code § 632**
*(On behalf of Plaintiffs & the California Sub-Class)*

203.   Plaintiffs repeat and reallege paragraphs 1 through 142 as if fully set forth herein.

204.   California Penal Code § 632(a) makes it unlawful for any person to intentionally and without the consent of all parties to a confidential communication, use any electronic amplifying or recording device to eavesdrop upon or record the confidential communication.

205.   Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."

206.   Plaintiffs' and Class members' communications with STIIIZY's Website—including their browsing activity, product selections, personal information entries, and purchase transactions—were confidential communications. Plaintiffs and Class members reasonably expected that their interactions with a cannabis dispensary's website, which involved the disclosure of sensitive health-related information including cannabis purchasing preferences and medical marijuana patient status, would be confined to the parties to those communications.

207.   The circumstances of these communications reasonably indicated a desire for confidentiality: Plaintiffs and Class members were accessing a website that collected personal health information, including information about cannabis use and purchases, which is subject to statutory privacy protections and carries significant social stigma.

208.   STIIIZY, through its embedded third-party tracking pixels, cookies,

50

session replay tools, and other surveillance technologies, intentionally and without the consent of all parties eavesdropped on and recorded Plaintiffs' and Class members' confidential communications with STIIIZY's Website.

209. These tracking technologies functioned as "electronic amplifying or recording device[s]" within the meaning of Section 632(a), capturing and recording keystrokes, mouse movements, scroll depth, form field entries, page views, and other details of Plaintiffs' and Class members' confidential interactions with the STIIIZY website.

210. STIIIZY did not obtain the consent of Plaintiffs or Class members before recording their confidential communications.

211. As a direct and proximate result of STIIIZY's violations of Section 632, Plaintiffs and Class members have suffered harm, including the invasion of their privacy, the exposure of their confidential health-related information to unauthorized third parties, and the resulting targeted advertising based on their private cannabis-related activities.

212. STIIIZY's conduct was knowing and intentional, undertaken to monetize sensitive medical-usage data for its own commercial gain.

213. Plaintiffs therefore, on behalf of themselves and the Class, seek all relief authorized under Cal. Penal Code § 637.2, including preliminary and equitable relief such as an injunction prohibiting further recording of confidential communications; actual damages, but in no event less than the greater of $100 per day of violation or $1,000 in statutory damages per plaintiff; punitive damages; and an award of reasonable attorneys' fees and litigation costs.

**SEVENTH CAUSE OF ACTION**
**INTRUSION**
**_(On behalf of Plaintiff R.M. & Medical Sub-Class)_**

214. Plaintiff R.M. repeats and realleges paragraphs 1 through 142 as if fully set forth herein.

51

215. Plaintiff R.M. and Class Members had a reasonable expectation of privacy in their communications with STIIIZY's Website. That expectation arose from the nature of STIIIZY's Website as a cannabis dispensary—browsing of which by definition reveals the visitor's status as a cannabis consumer; from California's extensive statutory framework protecting cannabis-patient confidentiality, including Cal. Health & Safety Code § 11362.5, Cal. Bus. & Prof. Code §§ 26162, 26161.5, and the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56 et seq.; from STIIIZY's own uniform representation across all three Privacy Policy versions that it did not "sell" customer personal information; and from the age-verification and identification requirements that STIIIZY itself imposes as a condition of accessing the delivery portion of its Website.

216. STIIIZY's intentional and surreptitious transmission of Plaintiff's and Class Members' cannabis-related health information to several third-party recipients constitutes a serious and highly offensive intrusion into a matter as to which Plaintiffs had a reasonable expectation of privacy.

217. The intrusion was highly offensive to a reasonable person because it involved: (a) affirmative concealment through uniform Privacy Policy representations that STIIIZY did not sell personal information, when in fact STIIIZY was engaged in commercial cookie-sync arrangements with data-marketplace operators whose business model is the resale of consumer behavioral signals; (b) the transmission of categorically sensitive health information—cannabis purchase data—paired with full names, email addresses, mobile phone numbers, precise latitude and longitude coordinates, and Facebook account identifiers; and (c) operation within California's cannabis privacy framework, which specifically protects cannabis-patient information against disclosure for non-treatment purposes.

218. As a direct and proximate result of STIIIZY's intrusion, Plaintiff R.M.

52

and Class Members suffered injury, including the loss of privacy in their cannabis-related health information, the diminution in value of their personal information, exposure to unwanted targeted advertising that publicly signals their cannabis consumption, and the other harms set forth in the preceding paragraphs. Plaintiff R.M. and Class Members seek compensatory damages, punitive damages, declaratory relief, injunctive relief, and all other remedies available under California law.

**EIGHTH CAUSE OF ACTION**
**PUBLICATION OF PRIVATE FACTS**
***(On behalf of Plaintiff R.M. & the Medical Sub-Class)***

219. Plaintiff R.M. repeats and realleges paragraphs 1 through 142 as if fully set forth herein.

220. Plaintiff R.M. and the Medical Sub-Class had reasonable expectations of privacy in their communications with STIIIZY's Website—expectations rooted in the traditional confidentiality of the physician-patient relationship and California's extensive statutory framework protecting cannabis-patient information, including the CMIA, Cal. Civ. Code § 56 et seq., Business and Professions Code §§ 26162, 26161.5, and Health and Safety Code § 11362.713.

221. STIIIZY publicly disclosed Plaintiff's and Medical Sub-Class members' private facts by transmitting their personal and health information to several third-party advertising platforms without their knowledge or consent. This transmission constitutes "public disclosure" under California law: the recipients are not confidential custodians but sophisticated commercial data aggregators—including Lotame, whose express business model is to pool, enrich, and resell the consumer behavioral signals it receives across its global data exchange.

222. Once injected into that ecosystem, mass dissemination is not merely possible but inevitable. A single Website visit propels a patient's cannabis status, purchase history, geolocation, and identifying information into a programmatic

53

advertising marketplace where it is instantaneously broadcast to an unlimited and unknowable number of downstream recipients.

223. The disclosed information constitutes highly private facts. For members of the Medical Sub-Class, the data transmitted—including cannabis purchase history tied to a physician's recommendation, geolocation signals revealing which dispensary the patient frequents, device identifiers linking subsequent activity to the same patient, and full legal name and email address— collectively reveal not only who the patient is, but that they are a certified medical cannabis user, what products they seek, and when and where each interaction occurs. Taken together, these data points constitute protected medical information that a reasonable cannabis patient would expect to remain strictly confidential.

224. The disclosure of this information is highly offensive to a reasonable person. Medical cannabis patients face documented stigma that affects their employment, housing, and social relationships—a reality the California Legislature expressly recognized in making the state's identification card program entirely voluntary and exempting patient information from the Public Records Act.

225. The unauthorized broadcast of a patient's cannabis use and medical purchasing history to commercial advertising networks—enabling that information to follow the patient across unrelated websites, social media platforms, and mobile applications, and to be observed by employers, family members, or government actors—is precisely the harm California's cannabis privacy framework was designed to prevent.

226. The private facts disclosed by STIIIZY are not of legitimate public concern. A medical cannabis patient's treatment choices, purchasing history, and dispensary visits are personal health decisions that bear no relationship to any matter of public interest.

227. STIIIZY affirmatively configured its Website to transmit patient data

54

to advertising platforms, maintained commercial relationships with data-marketplace operators for the mutual exchange of value, and concealed the full scope of these arrangements behind uniform Privacy Policy representations that it did not sell personal information. This conduct was knowing, intentional, and undertaken in conscious disregard of patients' privacy rights.

228. As a direct and proximate result of STIIIZY's disclosures, Plaintiff R.M. and Medical Sub-Class members suffered harm, including emotional distress, reputational harm, invasion of privacy, unwanted targeted advertising that publicly signals their medical cannabis use, and the diminution in value of their personal health information.

229. Plaintiff R.M. and Medical Sub-Class members are entitled to recover actual, compensatory, and punitive damages, disgorgement of profits obtained by STIIIZY from the use or sale of their private medical information, injunctive relief requiring STIIIZY to implement appropriate data safeguards and to cease further disclosures, and all other relief the Court deems just and proper.

### NINTH CAUSE OF ACTION
### VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*

### *(On behalf of Plaintiffs & the Nationwide Class)*

230. Plaintiffs repeat and reallege paragraphs 1 through 142 as if fully set forth herein.

231. The ECPA protects both sending and receipt of communications.

232. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

233. Electronic Communications are "transfer[s] of signs, signals, writing, ... data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects

interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

234. The transmission of Plaintiffs' communications with Defendant's Website qualifies as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

235. The transmission of personal and health information between Plaintiffs and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

236. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

237. The ECPA defines interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."

238. The ECPA defines "electronic, mechanical, or other device" as "any device ... which can be used to intercept a[n] ... electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a) The computer codes and programs Meta, Google, and Lotame used to track Plaintiffs' and Class Members' communications while they were navigating the Website;

(b) Plaintiffs' and Class Members' browsers;

(c) Plaintiffs' and Class Members' mobile devices;

(d) Defendant's, Meta's, Google's and Lotame's web and ad servers;

56

(e) The plan Defendant, Meta, Google and/or Lotame carried out to effectuate the tracking and interception of Plaintiffs' and Class Members' communications while they were using a web browser to navigate the Website.

239. By utilizing and embedding the Tracking Technologies on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiffs and Class Members in violation of 18 U.S.C. § 2511(1)(a).

240. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications through the Meta Pixel as well as Google and Lotame tracking codes, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' personal and health information to third parties, such as Meta, Google and Lotame.

241. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiffs and Class Members regarding personal and health information, including the details of the cannabis purchases. This confidential information was then monetized for targeted advertising purposes.

242. By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

243. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant

57

violated 18 U.S.C. § 2511(1)(d).

244. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

245. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, and CIPA, among others.

246. Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

247. Plaintiffs and Class Members suffered damages as a direct and proximate result of Defendant's invasion of privacy when learning Defendant intruded upon, intercepted, transmitted, and used their sensitive private information for commercial purposes.

248. Defendant received substantial financial benefits from using Plaintiffs' and Class Members' private communications without providing any value or benefit to Plaintiffs or Class Members, since Defendant used unlawfully acquired data to market its products, thus increasing revenue and giving itself unfair commercial advantage.

249. Plaintiff and Class Members suffered diminution in value of their Private Information and loss of privacy due to Defendant secretly obtaining and disclosing private communications to unauthorized third parties, and that Plaintiffs and Class Members intended to remain private.

250. Defendant intentionally used wire or electronic communications to increase profit margins. Defendant specifically used Tracking Technologies to

58

obtain private communications and other private data for financial gain including targeted marketing.

251. Plaintiffs and Class Members did not authorize Defendant to acquire their communications' content for purposes of invading their privacy.

252. Any purported consent Defendant received from Plaintiffs and Class Members was not valid as it wasn't knowingly and intentionally given.

253. As a result of Defendant's ECPA violation, Plaintiffs and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is greater of $100 a day for each day of violation or $10,000, equitable and declaratory relief requiring Defendant to cease these practices and delete unlawfully gathered information, compensatory and punitive damages, and attorneys' fees and costs.

254. The declaratory and injunctive relief sought includes, but isn't limited to:

    a. Entering declaratory judgment against Defendant declaring that Defendant's interception of Plaintiffs' and Class Members' private communications violates the law;

    b. Entering an injunction against Defendant: i. Prohibiting Defendant from intercepting Plaintiffs' and Class Members' Private Information and requiring unlawfully gathered information be destroyed; ii. Requiring Defendant to alert and/or otherwise notify all users what information is, or was, collected, used, stored, and shared; iii. Requiring Defendant to obtain express consent from all parties to a communication before it records, stores, transmits, shares, processes, or otherwise uses any private communications or information; iv. Requiring Defendant to delete all illegally obtained conversations; v. Requiring Defendant to provide clear disclosure of their practices

59

concerning collection of private communications and information from both its users and third parties, as well as uses of such data; and, vi. Requiring that Defendant permanently cease its unlawful collection of private communications and information.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully request that the Court enter an order:

A.    Certifying the Class and appointing Plaintiffs as Class representatives;

B.    Finding that Defendant's conduct was unlawful, as alleged herein;

C.    Awarding declaratory relief against Defendant;

D.    Awarding such injunctive and other equitable relief as the Court deems just and proper, including injunctive relief;

E.    Awarding Plaintiffs and the Class members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.    Awarding Plaintiffs and the Class members pre-judgment and post-judgment interest;

G.    Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

H.    Granting such other relief as the Court deems just and proper.


DATED: May 12, 2026

Respectfully submitted,

*/s/ Victor J. Sandoval*

Victor J. Sandoval (SBN 344461)
Elena A. Belov*
**ALMEIDA LAW GROUP LLC**
3415 S Sepulveda Suite 1121
Los Angeles, CA 90034
T: 562-534-5907
*victor@almeidalawgroup.com*

60

*elena@almeidalawgroup.com*

Arturo Peña Miranda (SBN 325108)
Jennifer Czeisler*
Edward Ciolko*
**STERLINGTON, PLLC**
228 Park Avenue South, No. 97956
New York, New York 10003
Tel.:   407-259-0234
*arturo.pena@sterlingtonlaw.com*
*jen.czeisler@sterlingtonlaw.com*
*edward.ciolko@sterlingtonlaw.com*

***Pro Hac Vice*** forthcoming

*Attorneys for Plaintiffs and the Proposed Class*

61